J-A02017-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| QUINTON FERGUSON, | |
| Appellant | No. 1067 EDA 2015 |

Appeal from the Judgment of Sentence entered April 1, 2015,
in the Court of Common Pleas of Philadelphia County,
Criminal Division, at No(s): CP-51-CR-0004379-2013.

BEFORE:  OTT, RANSOM, and FITZGERALD,* JJ.

MEMORANDUM BY RANSOM, J.:                    **FILED APRIL 18, 2017**

Appellant, Quinton Ferguson appeals from the judgment of sentence, imposed April 1, 2015, following a jury trial resulting in his conviction of voluntary manslaughter and two firearm violations.[1]  We affirm.

The trial court summarized the pertinent facts as follows:

> Police Officer Todd Rose testified that in the early morning hours of December 2, 2012, when he was off-duty, he drove to the area of 52nd and Spruce Streets to get some food.  Upon arriving at Medina's Restaurant, Officer Rose proceeded to order his food when he heard loud voices, "a lot of ruckus and noise outside."
>
> Officer Rose then went outside to say hello to the owner's wife who was in a car parked outside the Sunoco Station on 52nd Street.  He estimated that he was talking

---

[1] 18 Pa.C.S. §§ 2503, 6106, and 6105.

*Former Justice specially assigned to the Superior Court.

to her for about 2 minutes when he observed a commotion at south 52nd Street, outside Medina's and the Chinese Store, with about ten to fifteen people involved. Their cars were double-parked, and they were very loud. Noticing this activity, Officer Rose told the owner's wife that it looked like there might be a shooting and suggested that she leave; she did.

Officer Rose stated that after he saw one of the cars pull off, he thought the commotion was over and returned to Medina's to see if his food was prepared. However, upon hearing more arguing outside, he went back to the doorway and saw that the vehicle had returned and the parties were arguing again.

Officer Rose then observed some type of physical altercation start. He saw a male emerge from his left, produce a firearm, and run to give the firearm to another male, who was standing about ten feet away from him. The man who received the firearm then shot the individual standing outside; the decedent fell to the ground. Meanwhile, the shooter put the firearm into his waist area; after someone handed him his crutches, the shooter moved toward Spruce Street.

The shooter [(later identified as Appellant)] was moving toward Officer Rose at a brisk pace; Officer Rose knocked him to the ground. Officer Rose then produced his service weapon in an attempt to hold [Appellant] on location until local police arrived.

Initially, Officer Rose told [Appellant] that he was a police officer and instructed him to toss his gun. They argued back and forth for about four or five minutes at which point Officer Rose discharged his weapon one time in the air, away from [Appellant].

After Officer Rose discharged the weapon, [Appellant] initially continued ignoring his instructions; however, upon reaching his firearm, [Appellant] complied and tossed it in the street.

Officer Rose asked the owner's wife to dial 911. Officer Rose estimated that he held [Appellant] for about four to five minutes, until the arrival of the police. The police arrested [Appellant] without incident.

\*\*\*

 Detective Theodore Hagan testified that he was assigned to investigate the shooting death of [the victim] and that as part of the investigation, he . . . retrieved a video from the China House on South 52nd Street. Detective Hagan acknowledged the presence of [Appellant] and [Appellant's co-defendant, Daquan Young ("Young")] in the courtroom.

 Detective Hagan commented on the video which was played for the benefit of the jury. He identified [Appellant], [Young] and the [victim] on the video.

 Detective Hagan noted that he attempted to interview people in the neighborhood several times but that he never learned anyone's true identity. Although he spoke with some members of the [victim's] family, he did not speak with the driver of the car, which the [victim] was getting in and out of on the video.

Trial Court Opinion, 10/28/15, 7-10 (citations and footnotes omitted).

Appellant chose to testify at trial with regard to his interactions with the victim during the hours before and leading up to the shooting. ***See*** Notes of Testimony ("N.T."), 06/24/2014, at 20-123. He testified that on the evening prior to the shooting, he and Young, as well as two others, went to a video-game tournament at a nearby residence. Because there was a cash prize, and Appellant was not sure who would be present, he decided to take a gun with him. Once arriving at the tournament he discovered that everyone was from the neighborhood, so Appellant decided to leave the gun in the trunk of his friend's car.

After the group left the tournament, Appellant retrieved his gun, but asked Young to carry it. According to Appellant, he was afraid to carry the

gun while walking with crutches for fear he would drop it and the gun would fire. They began to walk toward Appellant's house but then stopped to get some Chinese food. Appellant stated that the Chinese store was crowded. At some point the visibly-intoxicated victim, whom Appellant had never seen before in the neighborhood, told Appellant that he should pay for the victim's food order. When Appellant stated that he would not do so, the victim hurled threats at Appellant. Appellant's friend intervened, and another person from the neighborhood attempted to escort the victim out of the store. At that point, Appellant left the Chinese store and started to wait outside for his food.

A second interaction with the victim occurred as Appellant was leaning against a pole outside the store eating the food he had purchased. According to Appellant, the victim continued to direct different threats at him. The victim eventually left the store area and walked up Delancey Street. After a while, however, Appellant saw a car coming from Spruce Street and pulling up in front of the Chinese store area. Appellant noticed the victim, whom he did not expect to return, get out of the car. Appellant also noted that the man who got out of the driver's seat was someone named Reem, whom Appellant knew from the neighborhood.

Although Appellant did not feel the need to leave the Chinese store area after his first two interactions with the victim, he believed he should pay attention to the victim's actions, which were still animated. According to Appellant, he decided to talk with Reem in an attempt to "de-escalate" the

situation. Appellant wanted Reem to know that he was the person the victim earlier had a "beef" with on 52nd Street. Appellant testified that, he wanted to make sure that he did not have to worry about future encounters with the victim. Appellant never got Reem's attention, however, and the car left the scene.

Appellant further testified that, as he was standing there, his brother and his brother's girlfriend rode by in a white car. The vehicle pulled over near Delancey Street, and Appellant went up to the car to talk about the tournament. In the meantime, Young allegedly talked to someone named "Karif" to relay a message to Reem.

As Appellant returned to the Chinese store area, he saw Reem's car return to the scene. Reem got out of the car and walked over to another car double parked in front of his, just in front of the Chinese Store. Reem and Karif began to have a conversation. The victim also exited the car and approached the two men, but Reem pushed him back and the victim went back into Reem's car. After a while, Appellant called to Reem, who had re-entered his car, and Reem told Appellant to "hold-up." According to Appellant, he approached Reem's vehicle so that he could "de-escalate" the situation by talking directly to Reem. Almost immediately, the victim exited the vehicle once again and approached Appellant. Referring to the video tape as it played, Appellant testified:

> A. Right now I'm backing up from [the victim] and he's yelling things. He's saying he's going to put hands and feet on me right now. You thought I was playing. I'm

- 5 -

going to F you up. And then I'm still backing up away. I call Reem. Reem act like he wasn't trying to get his company. And I throw the crutches because [the victim] kept saying, I'm about to put hands and feet on you. I'm going to put hands and feet on you." And I know that I wouldn't be able to defend myself with crutches in my hand. Or I had a better chance of at least trying to block a punch with the crutches out of my hand. Then he swings. And my cousin swings on him to get him away from me. I fall to the ground. And as I'm getting up from the ground, he stopped and said, Now you know what it is now. You know what it is now.

Q. What did you think that was? What did you think he meant?

A. In my mind, in the area I went, it means he's going to get a gun.

Q. And what does he do?

A. When [the victim] goes to the car and the car stops ahead of him and he reaches in the car, that's when I call [Young]. Because I'm going to think he's about to get a gun. And I tell [Young], I told [him], I need it. And then [the victim] pointed at me and said, Hand me the twister. Hand me the twister. And [a woman standing by the passenger door is] screaming, No. Don't give it to him, Reem. Don't give it to him. And [the victim] is still reaching and saying, I'm going to blow your F-ing head off. And he's reaching into the car. And when I see her pushing the gun down so Reem can't – like trying to prevent Reem from giving [the victim] the gun, I seen him reach in the car and I shot him.

N.T. at 62-64.

The defense presented no other testimony. In rebuttal, the Commonwealth entered two stipulations; one regarding a prior incident in which, when stopped, Appellant had a gun "attached" to his person, and the

- 6 -

other consisting of expert testimony describing the safety features of the gun that Appellant had used to shoot the victim.

The jury acquitted Appellant of first-degree, third-degree murder, and conspiracy, but convicted him of voluntary manslaughter and carrying a firearm without a license. That same day, the trial court found Appellant guilty of an additional firearm violation. On April 1, 2015, the court sentenced him to an aggregate term of nine and one-half to nineteen years of imprisonment, and a consecutive ten-year probationary term.[2] Appellant filed a timely appeal. Both Appellant and the trial court have complied with Pa.R.A.P. 1925.

Appellant raises the following issues:

1. Was not the evidence insufficient to support the verdict of voluntary manslaughter where the Commonwealth failed to disprove beyond a reasonable doubt that [Appellant] was not acting in self-defense?

2. Did not the trial court err as a matter of law and abuse its discretion in permitting the Commonwealth to introduce as purported "rebuttal", evidence of a prior conviction that did not rebut [Appellant's] statement that it was easier for him not to carry a weapon due to his disability and that was impermissible propensity evidence so prejudicial that it undermined his defense of self-defense?

---

[2] The jury found Young guilty of the same charges. The trial court sentenced him to an aggregate term of five to ten years of imprisonment, and a consecutive seven-year probationary term.

3. Did not the trial court err as a matter of law and abuse its discretion by denying [Appellant's] motion to preclude cross-examination of his character witness, using a stale and unfairly prejudicial prior juvenile adjudication?

Appellant's Brief at 3.

Appellant first challenges the sufficiency of the evidence supporting his voluntary manslaughter conviction. Initially, we set forth our standard of review:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable a fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilty may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the [trier] of fact while passing upon the credibility of the witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

**Commonwealth v. Hansley**, 24 A.3d 410, 416 (Pa. Super. 2011) (citations omitted).

"In order to procure a verdict of voluntary manslaughter, the Commonwealth has the burden of proving beyond a reasonable doubt that

the homicide was not a justifiable act of self-defense." **Commonwealth v. Smith**, 710 A.2d 1218, 1220 (Pa. Super. 1998) (citation omitted). "A killing which occurs because of a mistaken belief that facts of justification exist will constitute voluntary manslaughter." **Id.** The criminal statute provides, in pertinent part"

> **§ 2503. Voluntary manslaughter**
>
> **(b) Unreasonable belief killing justifiable.**—A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify the killing under Chapter 5 of this title (relating to general principles of justification), but his belief is unreasonable.

18 Pa.C.S. § 2503(b). Stated differently, to obtain a conviction, the Commonwealth has the burden of proving beyond a reasonable doubt that the defendant killed the victim without justification based upon a mistaken, unreasonable belief that the act was justified. **Smith**, **supra**.

With regard to a claim of self-defense, this Court has recently summarized the applicable presumptions and burden of proof as follows:

> The defendant has no burden to prove his self-defense claim. [Our] Supreme Court explained the evidentiary burden as follows: While there is no burden on the defendant to prove the [self-defense] claim, before the defense is properly at issue at trial, there must be some evidence, from whatever source to justify a finding of self-defense. If there is any evidence that would support the claim, then the issue is properly before the fact finder.

*Commonwealth v. Smith*, 97 A.3d 782, 787 (Pa. Super. 2014) (citations

omitted).

> If the defendant properly raises self-defense under Section 505 of the Crimes Code, the burden is on the Commonwealth to prove beyond a reasonable doubt that the defendant's act was not justifiable self-defense.
>
> The Commonwealth sustains this burden if it establishes at least one of the following: 1) the accused did not reasonably believe that he was in danger of death or serious bodily injury; or 2) the accused provoked or continue the use of force; or 3) the accused had the duty to retreat and the retreat was possible with complete safety.
>
> The Commonwealth must establish only one of these three elements beyond a reasonable doubt to insulate its case from a self-defense challenge to the evidence.

*Id.*

"The Commonwealth can negate a self-defense claim if it proves the

defendant did not reasonably believe he was in imminent danger of death or

great bodily injury and it was necessary to use deadly force to save himself

from that danger. *Id.* (citing *Commonwealth v. Sepulveda*, 618 Pa. 262,

288-89, 55 A.3d 1108, 1124 (2012). Our Supreme Court has described the

requirement of "reasonableness" as follows:

> The requirement of reasonable belief encompasses two aspects, one subjective and one objective. First the defendant must have acted out of an honest, bona fide belief that he was in imminent danger, which involves consideration of the defendant's subjective state of mind. Second, the defendant's belief the he needed to defend himself with deadly force, if it existed, must be reasonable in light of the facts as they appeared to the defendant, a consideration that involves an objective analysis.

*Commonwealth v. Mouzon*, 617 Pa. 527, 551, 53 A.3d 738, 752 (2012).

In *Smith*, we further noted:

> As the *Mouzon* Court observed, the use of deadly force itself cannot be viewed in isolation with the victim as the sole physical aggressor and the defendant acting in responsive self-defense. This would be an incomplete and inaccurate view of the circumstances for self-defense purposes. To claim self-defense, the defendant must be free from fault in provoking **or escalating** the altercation that led to the offense, before the defendant can be excused from using deadly force. Likewise, the Commonwealth can negate a self-defense claim by proving the defendant used more force that reasonably necessary to protect against death or serious bodily injury.
>
> When the defendant's own testimony is the only evidence of self-defense, the Commonwealth must still disprove the asserted justification and cannot simply rely on the jury's disbelief of the defendant's testimony[.]
>
> \*\*\*
>
> A number of factors, including whether the [victim] was armed, any actual physical contact, size and strength disparities between the parties, prior dealings between the parties, threatening or menacing actions on the part of the [victim], and general circumstances surround the incident, are all relevant when determining the reasonableness of a defendant's belief the that the use of deadly force was necessary to protect against death or serious bodily injuries. No single factor is dispositive. Furthermore, a physically larger person who grabs a smaller person does not automatically invite the smaller person to use deadly force in response.

*Smith*, 97 A.3d at 788 (citations omitted).

The trial court concluded that the Commonwealth's evidence when properly viewed, *Hansley*, *supra*, established the elements of voluntary manslaughter, and disproved Appellant's claim of self-defense:

- 11 -

Here, [Appellant] admitted that he fired shots at the [victim] but said that he did so in self-defense because he believed that the [victim] was about to use deadly force against him. In the case *sub judice*, the question was whether, considering the available evidence, a reasonable person would have believed that he was in imminent danger of death or great bodily harm, which would have justified his act of self-defense. In light of all the circumstances known to [Appellant], even if he actually believed that he needed to use deadly force to protect himself, his belief was unreasonable. By rendering its verdict of voluntary manslaughter, the jury demonstrated that it concluded that a reasonable person would not have had this belief.

Although the [victim] was the initial aggressor and, in fact, seriously provoked [Appellant] – going from verbal abuse to physical abuse to asking the driver of the car to hand him a "twister" and reaching into the car as if to get a gun – [Appellant] acted under an unreasonable belief that these circumstances would have justified the use of deadly force against [the victim].

This court finds that, in the heat of conflict, [Appellant] failed to evaluate the danger carefully and make precise judgments about exactly how much force was need to protect himself. Furthermore, [Appellant] could have refrained from using deadly force by safely retreating and thereby removing himself from a dangerous situation; however, he failed to do so. Instead, he himself went up to the [victim] in the middle of a highly escalated situation thereby neglecting his duty to retreat.

Upon considering the realities of the situation faced by [Appellant], the jury properly assessed that the Commonwealth proved beyond a reasonable doubt that [Appellant] did not believe that he was actually in danger of death or serious bodily injury to the extent that he needed to use deadly force in self-defense and that if [Appellant] did hold that belief, the belief was unreasonable.

Trial Court Opinion, 10/28/15, at 26-27.

- 12 -

Our review of the record supports the trial court's conclusions. Here, Commonwealth had no witnesses to the shooting. Thus, the only evidence it could present was the surveillance video. This Court has reviewed the surveillance video tape from this incident, which has no audio, on several occasions. Although the shooting occurred quickly, arguably Appellant introduced deadly force into what until that time was a physical altercation when he emerged from the group of people on the street and approached the victim. *See Smith*, 710 A.2d at 1220 (holding that Commonwealth negated a self-defense claim by proving the defendant used greater force that was reasonably necessary to protect against death or serious bodily injury). If so viewed by the jury, the Commonwealth disproved Appellant's claim of self-defense. *Id.* While Appellant testified that he interpreted the victim's alleged statements of "Now you know what it is now. You know what it is now," as indicating he was going for a gun, it was up to the jury to accept his testimony as reasonable, as well as Appellant's further claim that he saw the victim reaching for a gun.[3] Clearly, it was within the jury's province to discredit Appellant's version of the incident. *Commonwealth v. Bullock*, 948 A.2d 818, 824 (Pa. Super. 2008). Thus, Appellant's sufficiency challenge fails.

---

[3] Appellant contends that the trial court found as fact that the victim was reaching for a gun. The jury was the finder of fact and it was exclusively in their province to accept Appellant's testimony.

In his next issue, Appellant claims that he was prejudiced by the trial court's permitting the Commonwealth to place certain stipulations on the record during its rebuttal, because a prior gun incident was not relevant and therefore merely introduced as propensity evidence. We disagree.

As our Supreme Court has summarized:

> Appellate courts typically examine a trial court's decision concerning the admissibility of evidence for abuse of discretion. An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous. Typically, all relevant evidence, *i.e.*, evidence which tends to make the existence or non-existence of a material fact more or less probable, is admissible, subject to the prejudice/probative value weighing which attends all decisions upon admissibility. **See** Pa.R.E. 401; Pa.R.E. 402[.]

**Commonwealth v. Dillon**, 925 A.2d 131, 136-37 (Pa. 2007). In general, evidence of uncharged crimes or prior bad acts is inadmissible to demonstrate a defendant's propensity to commit the crime charged. **Commonwealth v. Shull**, 148 A.3d 820 (Pa. Super. 2016).

In this case, the trial court explained why its decision to allow the Commonwealth to introduce rebuttal evidence was neither error nor an abuse of discretion:

> Here, in response to [Appellant's] assertion that he did not want to carry a firearm on him the night of the shooting because of his lifelong disability requiring the use of crutches, the Commonwealth introduced evidence that on January 10, 2008, [Appellant] was arrested for a

firearm violation after a pedestrian investigation when the police recovered one black revolver, .38 special, loaded with six live rounds from [Appellant's] person. Based on the officer's recollection, he was not using crutches at the time he was arrested.

In the case at bar, the evidence of [Appellant's] prior gun possession was not introduced in order to show [Appellant's] bad character or criminal propensity. Instead, it was introduced for a legitimate purpose of rebutting [Appellant's] testimony that he did not want to carry a handgun on his person because of his disability.

Furthermore, the court cautioned the jury not to infer [Appellant's] guilty in this case on the evidence that in the past he carried a handgun on his person. This court explained to the jury that the evidence could be considered for one purpose only – to help the jury assess the credibility and weight of the testimony [Appellant] gave at trial.

This court is satisfied that the probative value of this evidence outweighs its possible prejudicial effect and that the evidence of [Appellant's] prior gun possession was therefore admissible.

Trial Court Opinion, 10/28/15, at 30.

Once again, our review of the record supports the trial court's conclusions. As noted by the trial court, a limiting or cautionary instruction "may ameliorate the prejudicial effect of the proffered evidence." *Id.* at 29 (citing *Commonwealth v. Tyson*, 119 A.3d 353, 360 (Pa. Super. 2015). A jury is presumed to follow the trial court's instructions. *Commonwealth v. Faurelus*, 147 A.3d 905 (Pa. Super. 2016). Thus, Appellant's second claim is meritless.

Appellant presents his final issue as follows:

> [Appellant] declined to present a witness to his reputation for non-violence due to the trial judge's decision to permit the Commonwealth to cross-examine the character witness as to whether he was aware of a stale juvenile adjudication of [Appellant's]. Reputation witnesses may only be cross-examined regarding a defendant's specific instances of misconduct resulting in a *conviction* probative of the character trait in question. The proffered cross-examination material was a juvenile adjudication, not a conviction, as prescribed by Pa.R.E. 405(a)(2). Also, the adjudication was too remote in time to be probative. Its prejudicial effect outweighed its limited impeachment value.

Appellant's Brief at 15.

Before the parties' opening arguments on the first day of trial, the trial court inquired of defense counsel regarding their motion *in limine* regarding the use of character testimony that the parties previously had discussed off the record. N.T., 6/24/14, at 136. The trial court deferred ruling on the motion and defense counsel agreed not to mention the reputation evidence when opening to the jury. At the beginning of the third day of trial, the trial court and the parties revisited Appellant's motion. After hearing the arguments of the parties, the trial court denied Appellant's motion. ***See*** N.T., 6/26/14, 4-8.

Defense counsel then made the following statement:

> [DEFENSE COUNSEL]: **So it would be clear for the record that we will not forego [sic] presenting this critical character testimony for peacefulness based on your –** [ruling].

N.T., 6/26/14, at 9 (emphasis added).

Within its brief, Appellant does not explain the above statement. Nevertheless, the defense did not call any character witnesses.

"It is well-settled that the scope of cross-examination is a matter within the trial court's discretion and will not be disturbed absent an abuse of that discretion." *Commonwealth v. Kouma*, 53 A.2d 760, 768 (Pa. Super. 2012) (citation omitted). When examining the admission or exclusion of impeachment evidence in the context of character witnesses, this Court has further noted:

> In a criminal case, the defendant may offer character witnesses to testify as to that defendant's reputation in the community regarding a relevant character trait. *See* Pa.R.E. 404(a)(1); 405(a). Of course, the Commonwealth may attempt to impeach those witnesses. *Commonwealth v. Hoover*, [] 16 A.3d 1148, 1149 (Pa. Super. 2011) (citing *Commonwealth v. Morgan*, 559 Pa. 248, 739 A.2d 1033, 1035 (1999). "For example, when cross-examining character witnesses offered by the accused, the Commonwealth may test the witnesses' knowledge about specific instances of conduct of the accused where those instances are probative of the traits in question." *Hoover*, 16 A.3d at 1149-50 (citing Pa.R.E. 405(a)). However, the Commonwealth may not cross-examine a character witness about a defendant's uncharged criminal allegations, *Morgan*, 739 A.2d at 1035-36, or a defendant's arrests that did not lead to convictions. *Commonwealth v. Scott*, 496 Pa. 188, 436 A.2d 607, 611-12 (1981).

*Commonwealth v. Kuder*, 62 A.3d 1038, 1057-58 (Pa. Super. 2013).

The trial court found no merit to Appellant's claim, concluding that the juvenile adjudication could be used for impeachment purposes, and that it was not stale:

- 17 -

In the present case, [Appellant] was adjudicated delinquent by admission of aggravated indecent assault, a felony of the second degree, on November 14, 2002. On November 29, 2002, [he] was committed to the Pennsylvania Clinical School where he remained until October 21, 2003; on December 3, 2003, Judge Reynolds committed [Appellant] to Benchmark School, another secure residential facility, where he remained until his discharge on January 11, 2005. This Court finds, therefore, that Pa.R.E. 609(b), which limits the use of evidence after 10 years, is inapplicable to the case at bar.

Here, the cross-examination of a witness attesting to [Appellant's] reputation of non-violence would have brought to light [Appellant's] prior juvenile record of being adjudicated for a crime of violence. Such cross-examination would have been conducted not to prove [Appellant's] bad character or criminal propensity but to impeach the credibility of [Appellant's] witness attesting to his reputation for non-violence. The cross-examination would have allowed [for] testing the "accuracy and completeness" of the witness's real knowledge of [Appellant's] reputation.

Trial Court Opinion, 10/28/15, at 32-33 (citation omitted).

We find that no error occurred. Contrary to Appellant's claim, although the general rule is that a juvenile disposition or other adjudication under the Juvenile Act "is not a conviction of crime," such a disposition may be "only be used against him" . . . in a criminal proceeding, if the child was adjudicated delinquent for an offense, the evidence of which would be admissible if committed by an adult." 42 Pa.C.S. §§ 6354(a), (b)(4). Clearly, if convicted as an adult, Appellant's prior aggravated indecent assault would be admissible to impeach evidence of his character for peacefulness. *See Commonwealth v. Ross*, 856 A.2d 93, 101-102 (Pa.

Super. 2004) (explaining that cross-examination of a character witness may include questions regarding a defendant's prior convictions for crimes involve the relevant character trait; the purpose of this type of impeachment is to test the accuracy and completeness of the witness's knowledge of the defendant's reputation).

Moreover, while we agree with Appellant's assertion that the ten-year rule of Rule 609, which by its terms is limited to *crimen falsi* offenses, has no application to his "dated" juvenile adjudication, ***see Ross***, 856 A.2d at 102, we cannot agree with his additional claim that the absence of a direct reference to juvenile adjudications in Rule 405(a)(2) renders the juvenile adjudication inadmissible. ***See*** Appellant's Reply Brief at 15-17. Section 6354 of the Juvenile Act permits the use of such dispositions in criminal proceedings. Finally, we discern no abuse of discretion in the trial court's weighing of the probative value of Appellant's prior adjudication vis-à-vis the potential prejudice to Appellant. Thus, Appellant's final issue merits no relief.

Judgment of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/18/2017